FITZ-INN AUTO PARKS, INC. *vs.* CITY OF BOSTON & others.[1]

Suffolk. January 3, 1983. — May 3, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, & NOLAN, JJ.

*Regulation. Administrative Law,* Regulations. *Motor Vehicle,* Parking.

The Boston air pollution control commission had authority under G. L.
  c. 111, § 31C, to adopt with the approval of the Department of En-
  vironmental Quality Engineering certain regulations limiting the
  number of commercial off-street parking spaces for motor vehicles in
  downtown Boston and providing for the granting of permits for such
  parking spaces. [82-83]
Operators of open-air parking lots in certain areas of Boston have no ab-
  solute right to transfer parking spaces from an abandoned location to
  another location. [83-84]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 19, 1980.

The case was heard by *Dolan, J.*

After review was sought in the Appeals Court, the
Supreme Judicial Court granted direct appellate review on
its own initiative.

*Paul G. Counihan (George L. Bernstein* with him) for the
plaintiff.

*John R. Devereaux,* Assistant Corporation Counsel, for
the defendants.

WILKINS, J. The plaintiff Fitz-Inn Auto Parks, Inc. (Fitz-
Inn), sought a declaration of its rights concerning regula-
tions issued by the defendant Boston air pollution control
commission (commission) in July, 1978, and approved by
the Commonwealth of Massachusetts Department of Envi-

---

[1] The parking and traffic commissioner of Boston and the other
members of the Boston air pollution control commission. We shall refer
to the defendants collectively as the commission.

ronmental Quality Engineering in August, 1978. The regulations, entitled Procedures and Criteria for Issuance of Parking Freeze Permits, limit the number of commercial off-street parking spaces in a defined area of downtown Boston and at Logan International Airport.[2] Fitz-Inn challenges the authority of the commission to adopt the regulations and further claims that the regulations, even if authorized, are unreasonable and unconstitutional as applied to it.

The case was presented in the Superior Court on the plaintiff's motion for summary judgment. There are no material facts in dispute. The motion judge rejected Fitz-Inn's claims and ordered the complaint to be dismissed. We agree with the motion judge's rejection of the merits of Fitz-Inn's claims, but reverse the judgment dismissing the complaint because, in this declaratory judgment proceeding, a judgment declaring the rights of the parties should be entered. See *MacKeen* v. *Canton*, 379 Mass. 514, 516 n.3 (1980).

From before October 15, 1973, until June 13, 1980, when its lease terminated, Fitz-Inn operated a licensed parking lot with twenty parking spaces at the corner of Kilby Street and Exchange Place in downtown Boston. The premises have since been devoted to other uses. Fitz-Inn operated numerous other licensed parking lots prior to October 15, 1973, which it has since ceased to operate for various reasons. The commission has declined to recognize Fitz-Inn's unconditional right to transfer the twenty spaces from the Kilby Street and Exchange Place site to another leased location in downtown Boston, although the commission did allow the transfer on a conditional and temporary basis.

There is an "actual controversy" within the meaning of G. L. c. 231A, § 1, concerning the lawfulness of the commission's freeze regulations and the application of the regulations to Fitz-Inn so as to deny it the absolute right to

---

[2] The number of spaces is "frozen" as of October 15, 1973, a date used in earlier regulations adopted under Federal authorization not involved in this case. See 40 C.F.R. § 52.1135 (1974).

transfer off-street parking spaces from one leased location to another off-street parking site. Although the record does not show that the commission denied Fitz-Inn the right to transfer spaces from one location to another, the commission did deny Fitz-Inn the absolute right to do so.

The regulations contain procedures for granting permits for commercial off-street parking facilities in certain portions of Boston. The regulations were purportedly adopted pursuant to G. L. c. 111, § 31C, material parts of which are set forth in the margin.[3] The regulations provide that no person may commence construction or modification of a commercial parking facility within the designated areas without a "Parking Freeze Permit." A commercial parking facility includes any lot or structure where motor vehicles are parked temporarily for a fee. Parking on public streets, parking limited to residents (and their guests) of a residential building or buildings, and parking exclusively for customers or employees are excluded. The number of commercial parking spaces available for allocation under the regulations will come from commercial parking spaces and legal on-street parking spaces that have been eliminated. "Rights to eliminated parking spaces cannot be transferred by or between any persons or entities but shall revert back [sic] to the City for listing and use as spaces available for allocation." All permits for a temporary lot expire annually and are subject to redistribution, particularly to a permanent parking facility.

---

[3] General Laws c. 111, § 31C, as amended by St. 1975, c. 706, § 170, provides: "A board of health, or other legal authority constituted for such purpose by vote of the town or city council shall have jurisdiction to regulate and control atmospheric pollution, including, but not limited to, the emission of smoke, particulate matter, soot, cinders, ashes, toxic and radioactive substances, fumes, vapors, gases, industrial odors and dusts as may arise within its bounds and which constitutes a nuisance, a danger to the public health, or impair[s] the public comfort and convenience.

"Said board of health or other legal authority, subject to the approval of the department of environmental quality engineering, in this section called the department, may from time to time adopt and shall enforce reasonable rules and regulations for the control of atmospheric pollution."

We construe G. L. c. 111, § 31C, as authorizing the commission to impose by regulation a limit on the number of permitted off-street commercial parking spaces in designated portions of Boston. Section 31C grants jurisdiction to the commission "to regulate and control atmospheric pollution" and "from time to time [to] adopt . . . reasonable rules and regulations for the control of atmospheric pollution," if those rules and regulations are, as they were here, approved by the Department of Environmental Quality Engineering. We shall assume that the only atmospheric pollution that may be regulated is that "which constitutes a nuisance, a danger to the public health, or impair[s] the public comfort and convenience."[4] Fitz-Inn does not claim that motor vehicles do not contribute to atmospheric pollution. It claims, however, that § 31C does not authorize regulation of the use of land and that § 31C deals only with direct sources of pollution and not with parking lots which produce no emissions directly.

The fact that Boston may regulate parking uses by zoning ordinances[5] and may license open-air parking spaces pursuant to G. L. c. 148, § 56, does not bar further regulation by other means authorized by law. Municipal regulation by a combination of zoning controls and other statutorily authorized means is proper. See, e.g., *Lovequist* v. *Conservation Comm'n of Dennis*, 379 Mass. 7, 13 (1979) (wetlands protection); *Beard* v. *Salisbury*, 378 Mass. 435, 439 n.7 (1979) (earth removal). Certainly, § 31C is directed toward land use control, but that fact alone does not lessen the commission's authority. Nor is § 31C limited to stationary sources of pollution, as was one (but not all) of the statutory authorizations considered in *South Terminal Corp.* v. *EPA*, 504 F.2d 646, 668 (1st Cir. 1974). We view a restriction on

---

[4] The concluding clause of the first sentence of § 31C (see n.3 above) is inartfully drafted. The function of the "and which" clause is ambiguous and is further troubled by the plural verb "impair."

[5] We need not decide whether G. L. c. 40A, The Zoning Act, applies to Boston. If G. L. c. 40A does not apply to Boston, a special act authorizing zoning ordinances in Boston does. See St. 1956, c. 665.

the number of off-street parking spaces as a reasonable means of regulating and controlling atmospheric pollution.

Fitz-Inn frankly grants that, if it had been allowed to retain its right to reallocate spaces lost when its original locations ceased to be available for parking, this action would probably not have been commenced. Fitz-Inn's real grievance, therefore, is its loss of an absolute right to retain a specific number of parking spaces in its name and to transfer them to locations for which it has or will have the necessary parking lot licenses and special zoning permits. Fitz-Inn's claim is that reasonable regulation of the number of off-street parking spaces in Boston, assuming regulation is allowed at all, requires a recognition of the continuing rights of those entities having permitted parking spaces as of the date the freeze became effective.

Fitz-Inn argues that it has a property interest in the right to operate a certain number of parking spaces independent of its right to operate a parking lot at a particular location. The city argues that the right to operate a parking lot relates to a particular location and that, when a lease at that location terminates, the right to operate the parking lot there belongs to the landowner who may lease the premises to another entity who in turn may operate a parking lot. If, as here, the lot ceases to be used for off-street parking, the question arises whether a former lessee has continuing rights in the number of parking spaces lost.

It is reasonable to place the allocation of the number of off-street parking spaces within the control of a governmental agency and not within the control of private entities. The freeze was not intended to reduce the number of off-street parking spaces below the number in operation when it became effective. If a private entity were allowed to "bank" or to hold in "inventory" spaces lost by it, public control over the number of spaces available would be relinquished to that extent to private entities. New parking locations, desirable to satisfy changing conditions or other needs, might not be established because the holders of dormant parking space "rights" might choose not to participate

at those locations.  In this respect, public regulation would be lost to private control, an undesirable and unreasonable result.

Fitz-Inn did not have a property interest protected in a constitutional sense from control by the freeze regulations. A parking lot lessee may have protectable rights at a particular location during the terms of its lease, but its rights end with the termination of its lease.  There is no showing that, even before the freeze, a lessee of an open-air parking lot had an absolute right to transfer parking spaces from an abandoned location to another location.  We see nothing in the freeze regulations intended to increase the rights of a parking lot owner or lessee.

The judgment dismissing the complaint is vacated and the case is remanded to the Superior Court for entry of a judgment declaring that G. L. c. 111, § 31C, authorized the adoption of regulations restricting the number of off-street commercial parking spaces in designated portions of Boston and that the plaintiff does not have the absolute right to the number of parking spaces operated by it as of the effective date of the parking freeze.

*So ordered.*